Good morning. I believe that we now have at least one of council on video and I would call the first case for argument the matter of government of government of the employees retirement system of the Virgin Islands versus the government of the Virgin Islands. And I would say before we begin the clock which we will ignore as historically this court traditionally this court has done in better times. The need to do so is even greater. Now that we are forced to use various forms of electronic communication which sometimes works and sometimes does not. This I will admit is my first occasion since the pandemic began in March to have participated myself from far and not having taken the bench. While my previous occasions of oral argument since then have involved at least one other member of the panel seated with me. I've been able I think to conduct an oral argument or to preside over an oral argument in a relatively efficient way. This is as I say a first for me with all three of us located in separate places. But I'm sure we'll be able to go forward and afford all three members of the panel as well as council an opportunity for meaningful Q&A. So with that said and I would look to Mr. Shirker on behalf of the government of the Virgin Islands to go forward for appellants. Good morning your honors and may it please the court with the court's permission I'd like to reserve three minutes for rebuttal. That's granted. Thank you your honor. In 1984 GERS and the GVI settled a dispute about bi-weekly pension contributions under section 718 of the Virgin Islands Code. Mr. Shirker let me interrupt you at this point. And this is really for your benefit so that the time you have is spent most meaningfully on the issues presented. Be assured that the members of the panel have read the briefing. And beyond that are familiar with the history of this matter which spans just short of four decades. And rather than have you recount that four decades which might eat all too much into your allotted time. Why don't we go into at the outset the issues actually presented in the briefing. We're familiar of course with the consent decree that was entered in this matter the original complaint having been filed a number of years before that. It's rather sparse complaint. I just took a look at it in recent days again. But as I understand your position the government's position that you are contending that what is requested what is sought has been sought by the retirement system which I'll refer to by its acronym as GERS. It sounds more like something of an exclamation than any kind of meaningful abbreviation. Do I understand you to be arguing that the missing fixed rate contributions that reached back to 1991 were outside the scope of the consent decree. Yes, Your Honor. Absolutely. The record fully establishes that the prior period employer contributions which GERS administrator calls legacy issues were caused over many years by many different causes including vagaries and employment dates job positions or commencement of participation. And the auditor explained that page 4052 of the Joint Appendix all the various and sundry reasons how these things happened beginning going back to 1991. Why should that read down to the benefit to the detriment rather of the system and its various pensioners its numerous pensioners. It seems to me that what you're arguing is that well that was not willful conduct on our part. And my response to that is so what what does willfulness or a lack of willfulness have to do with whether or not what we have here which is essentially a trust has a corpus the extent of which the size of which is less than it otherwise should have been had all payments been made and made in a timely basis. Let me answer that in two ways, Your Honor. First, if you refer the court to 408233 of the of the appendix in which the court appointed auditor testified that these these contributions are not missed by weekly contributions, the government did not miss a biweekly contribution. There are all these systemic reasons that occurred starting back in 1991 and they were not even discovered until 2012 that led to these prior period contributions, but the second part of it were were not discovered by either side in this case, right? That's correct. And we argue lack of willfulness only to the extent that we're challenging the interest in penalties not as a reason that we would not otherwise be believable. The reason we are not liable under the consent judgment is the consent judgment requires us to make biweekly payments and to disperse those biweekly payments to the system with a specific period of days. These we did so and these systemic issues which were only discovered in 2012 cannot be linked to a single date on which we missed or didn't make a biweekly appointment a biweekly payment on the question of GRS is entitlement to those monies. Our position is that the RSM audit which resulted in the finding of $18 million at prior period employer contributions and not the $72 million that GRS was was demanding that finding completely ignored the settlement between GRS and the government by which we have been conducting true ups as individual retirees come up for retirement and making lump sum payments to GRS of as much as $9.8 million. Over a period of time GRS his own counsel told the court at one of the last hearings that $4 million had been set aside for these prior period employer payments. We are making payments into GRS for the purpose of compensating GRS for the missing prior period employment contributions player contributions. So it's not a matter of disentitling GRS to money to which it was entitled. We have recognized the government has recognized entitlement to those monies and is doing that is accomplishing the payment by the true ups as employees retire know originally those troops were done on a case-by-case basis and GRS was building the government of the government was paying GRS concedes that it's lawful GRS concedes that the government has been maintaining its duties under the settlement and then ultimately GRS came to us and said we would like to have these in a lump sum. So we don't have to come to you each time we need a payment and we agreed to do that and we have done that and we are doing that and RSMs audit completely ignored those payments to GRS and coming up with the $18 million figure. So let's go back for a minute. Would judge Smith first asked, I mean, you're the government's Responsibility Council is a bi weekly comp contributions right. Correct. Okay. And your argument, maybe you can explain exactly how it is that missed prior employer contributions are aren't somehow within the scope of bi weekly contributions. Let me refer the court to page 4052 of the appendix and the report by RSM which lists and I can read them approximately 10 reasons for how these things came about people were not put into the system when they should have been put into the system. I get that there were reasons but it doesn't fall within the scope of bi weekly contributions. No, sir, does not. And that was the testimony of the auditor to the to the district court. We made the bi weekly contributions as as people were paid on a bi weekly basis. There's no suggestion that any individual payment was incorrect when it was made. And we cannot trace any of these systemic issues to any individual payment under 718 G going back to 1991. But you but you end up with a court appointed expert who does apply as to an amount, notwithstanding, whether they were gaps or inadequacies. However, we want to characterize them in the record of payments right and the and the district court credited that testimony. And that that testimony those findings fail to take into account that we are making payments and completely ignored. For example, the $9.8 million that we paid in a lump sum. So, so, so you're arguing that there was clear error here in the district courts findings, with respect to the accuracy of the experts findings and report. Yes, your honor. But let me explain what the what RSM did was basically take come up with a number by looking back as far as it could, which was precisely what they were charged with. Arrangement, which the district court essentially overturned by ordering us to pay the $18 million. The real world arrangement is we have been making those payments and are continuing to make those payments to GRS for prior period employer contributions. We are not before the court. Let me be perfectly clear. We are not before the court saying that we don't have an obligation to make those payments. We have never said so. We've never said so to the district court. What we've said is we are making those payments. And this $18 million figure is totally disconnected from reality for the reality of the settlement between GRS and the government. And under that settlement, we have have been and are continuing to make payments on the prior period employer contributions. So the $18 million figure is simply an unrealistic number that came up through a sterile accounting exercise that by their own admission did not include the payments that we're making. RSM admitted that it did not take those payments into account. And those are those are now lump sum payments that are sitting in that were being made to sit in GRS's treasury to be used as individuals retire. No single retiree has been shortchanged at the time of by the time of retirement because of the settlement between GRS and the government. All we're saying is that the court was required to honor that settlement as the contract that it was and say arguing right now that no employee up to this point has been shortchanged really is beside the point, isn't it? First of all, those individual pensioners are not parties to this proceeding. They're beneficiaries of a system which is actually the party and which has a responsibility to all of the pensioners and future pensioners. And as I understand the record and the projections, we're talking about a system that within a couple of years may go belly up would seem to be looking forward right now close to insolvency. Am I right? The government fully understands GRS's condition of the government was very frank with this court when we follow their motion for stay as to the government's financial condition at the present time, especially after after the hurricanes and then especially after the pandemic in terms of its revenues and its ability to pay the government can't even pay the 60 plus million dollar judgment that's imposed by the district by the district court. But yes, GRS needs money. The government of the Virgin Islands is in parlous financial condition. That's all true. But the the the forum for those presentations is the legislature, which is what GRS has been doing since 2013 when it after it found adopted the new computer system and found these missing money. GRS has been sending reports to the legislature on an annual basis, saying the way you need to fund this system to make it whole is to increase your biweekly percentage contributions. And those contributions have now been increased to 20.5%. The forum for GRS to present exactly what your honor detailed is not the court because the court has all that's the court only a consent judgment from 1984 amended in 1994 that requires that requires the government to make biweekly payments. That's all it requires the government to do. The government has been doing so when we fell behind after as a result of some other events. And then after the hurricanes, we settled on a number with GRS. We paid that amount plus interest and are not challenging that ruling at all. Those were our obligations. The question before this court is not whether GRS needs funding. The question before this court is whether the government is in contempt of the 1984 consent judgment. Well, I understand that that's not the question here, but you chose to advert to individual pensioners not having been shortchanged in any way. And I felt it necessary to remind you that they are not really the parties here and that it is not their individual interests that is the focus of this litigation. Judge Mady, I want to make sure you have an opportunity to ask questions here. Thanks, Chief. I appreciate that. Counsel, I'm curious, going back to your point where you mentioned that the government can't pay the judgment that is imposed by the district court here. If we were to affirm, what is the government planning to do with that judgment? Your Honor, I honestly don't know. I don't have anything before me or anything in the record to answer that question. We have the commissioner's affidavit attached to our stay motion before this court. As to the government's financial condition, there simply isn't a pot of money right now to reach into and pay the $18 million plus $49 million in interest. So typically in disputes where there is a judgment that one party claims cannot be satisfied, there are remedies that the prevailing party can seek in the court. Garnishment, things like that. Do you think those remedies are applicable here? If we're to affirm, do you think that GERS could come after the government's revenues in some other form and be the authority of this court? This judgment should be reversed because we are performing our obligation. And Chief Judge Smith, I take your point about individual retirees. But the point of the exercise that the government has gone through in making these lump sum payments is to give GERS the wherewithal to allow individuals to retire. So it's not a matter of our contractual relationship with the retirees. It's a matter of our contractual relationship with GERS under the settlement, which we're funding through lump sum payments at GERS' request. And quite frankly, the best answer to that is found in Mr. Nimtz's repeated testimony that the reason he wants all of this money up front is it would just to, just about quoting him word for word, make life easier to have all the money up front. GERS is aware that it's getting the money. It simply wants that money up front. And by getting an order that requires it to be paid up front, they've also fallen into $49 million in interest and penalties. Well, one can hardly blame a fiduciary of any kind, especially a pension system, for wanting money up front when all money has time value to it. And that is a very significant aspect of the management of any fund. So I'm not sure what your point is about there being something perhaps untoward about wanting your money up front if money is owed. I'm not suggesting anything untoward. What I'm suggesting is that the obligations are being met under an agreement between the parties and that simply to make it easier to have the money sitting somewhere is not a basis for getting an $18 million judgment, especially when there are funds being paid on a regular basis so that individuals can retire. Judge Gers, would you like to get some additional questions in, please, at this point? I have nothing more, Judge. I'm not struggling to get to my rebuttal time. Judge, no, you won't need it. As Judge Becker used to say, you're on our time. We're not going to put the hook out. We're going to give everybody an opportunity to argue for as long as we think is necessary to make your case. Judge Mady, would you like to get in again here, please? Nothing further from me at this time, Chief. All right. If that's the case, why don't I just give you a minute or two to wrap up here, Mr. Shirker, and then we'll hear from your friend on the other side, and then we'll have you back on rebuttal. Thank you, Your Honor. We'll rely on a brief of the arguments on interest and penalties. The point with which I'd like to leave the court is that we are under a consent judgment that requires us to do certain things. RSM's own auditor testified, Chief Judge Smith, in response to your observation, RSM's own auditor testified that it's consistent with best practices to do exactly what we're doing with the prior period employer contributions, to be making the lump sum arrangements and to be settling up as each retiree comes up for retirement. There's nothing odd about it. Now, the system would rather have the money up front, and that's understandable, and we're doing the best we can through lump sum payments. But that desire doesn't convert into a basis for finding us in contempt of an order. And the only other point I'd like to leave the court with is, as we point out in our motion for judicial notice, which is pending before the court, the 2020 GRS report details that we have now paid $42 million to GRS in direct contributions. We've been making payments pursuant to a special statute for a period of time now at $7 million a year. It now amounts to $42 million that we have directly contributed to GRS. If we're talking about damages, if we're talking about a judgment holding us in civil contempt and entering a money judgment against us, the $42 million dwarfs any debt that we might have to GRS under the court's judgment. Thank you. Thank you very much, Mr. Schertger. And as I indicated, we'll have you back on rebuttal. Thank you. Mr. Klasner. Thank you, Your Honor. We do have you with us, both by audio and video now. Thank you. Mr. Klasner, let me begin where Mr. Schertger almost left off, and that is he's indicated that his side would stand on the briefing with respect to the penalties and interest. So I'd like to hear from you on that, because putting aside for now the $18 million, tell me why the 2005 statutes imposing interest and delinquency fees on unpaid contributions ought to apply to the contributions that GBI missed prior to the statutes going into effect. That can't be right, can it? Yes, Your Honor, it is. And if I may, I'd like to explain. This was part of remedial legislation in 2005 that did a number of things, one of which was it created a new lower tier of benefits, raised the amount of money that employees have to take out of their paychecks and put into the system, and quite frankly, it added an incentive for the government to pay on time. So are you simply suggesting, because you used the word remedial, you're simply saying that just because a statute evinces a clear remedial purpose, that that's enough to justify imposing penalties on missed contributions that might otherwise seem to be creating an ex post facto problem? I don't think it's an ex post facto problem, Your Honor. The decree itself actually contemplated the future enactment of laws providing for the payment of interest and penalties. In the 84 decree, the judge said, gee, I wish I could, in the order, says, I wish I could award interest, but I don't have authority to do that now. But if I ever do, the decree will be amended. And by passing the statute, that amended the decree. And remember, this is not too different. Excuse me. Let me interrupt just so I am understanding what you just said. And when I referred to ex post facto, I was really using it in more of a generic sense, because what we're really talking about here in the civil context is an issue of retroactivity, which, of course, under our jurisprudence, Landgraf and others, we have a strong presumption against reaching back that way. But I want to make sure that I'm clear. You're suggesting that the 2005 amendments somehow sub silentio amended the consent decree and the obligations that flowed from it? It fulfilled an expression of concern by the judge in 1984. And remember, this isn't one entity placing a burden on another entity. This is the government of the Virgin Islands passed a law requiring itself to pay penalties and interest. Your Honor referred earlier to the time value. Where is there any clear textual indication that that's what the legislature, the unicameral legislative body of the Virgin Islands intended? There is no legislative history that we were able to. I didn't ask you about legislative history because our jurisprudence also says there's no need to look to legislative history if you've got a clear text that tells you something. I understand. So so where's the clear text that that tells us what your position appears to be that there was a legislative intent to have these 2005 amendments reach back? Why would you pass a law and not apply it to the problem? The text says if if benefits are because the problem may persist and may be going forward, if if contributions are not paid for a period forward. And actually, if you look at RSM's report, the greater sum of money that was at issue involved probably post 2005. But but your honor mentioned the time value of money. And Judge Gomez referred to that in his order as well, that if a debt's due. And you don't pay it, the debt be the debts owed every pay period that goes by every annual actuarial valuation that goes by and says you haven't paid what's necessary to maintain this system, then the debt, in essence, renews. And the calculation of the interest and penalty began on the day the statute became effective. It didn't go back and say, by the way, you owe me interest all the way back to 1991. You owe me interest from the effective date in 2005, which, according to the statute, I think was 90 days after the governor signed the bill. Well, can I just ask a question on this point? I'm not sure if I was following. Why why was this not brought to the district court to amend the consent judgment? As I understand it, the consent judgment says if an act is established by the legislature, this consent judgment shall be amended to reflect this change. I don't believe there's any representation that the party's ever sought to amend the consent decree. So what are we to do with that lack of amendment? I think the I think we look at what the purpose of the decree was. The purpose of the decree says, why would we get to the purpose to pick up on the chief's point? Why are we getting to the purpose of the decree when the language doesn't seem to have any lack of clarity? The language in the decree says we're going to pay all the contributions under 718. 718 provides for three kinds of contributions. The members contribution, which the government pulls from the paycheck, the fixed rate contribution, which has gone up over a period of time. I think it's 23 percent of payroll. And then in order to maintain the actuarial reserve, you're going to pay whatever else the actuary says is needed to to create this actuarial reserve. There's no ambiguity about that. The the purpose of the 94 amendment was to say, you know, you're not paying on time and do audits, create a bank account, show us where the money is. And and I think that the 2005 legislation simply says to the government, we the legislature are going to force you. We're going to force ourselves, in that sense, we're going to force ourselves to make up for the sin which was committed almost since the inception of the system. And I, you know, I've been a lawyer for 40, almost 44 years. There are some cases keep you up at night. This is one, because in two years, 25 percent of the gross domestic product of the Virgin Islands is going to disappear. Let me let me just go back to the point I was raising, which is, it seems on one hand, you're saying we need to follow the law. We need to read what is written in Section 718. On the other hand, you're saying we don't need to follow what's in the consent decree because it's obvious what was intended by the 2005 amendment. Why shouldn't we pick one or other in terms of our. You don't you don't have to. I think that the judges statement in 1984 that the decree will be amended by should you decide to create interest, which was done in the 2005 acts, then the decree will be amended. I read that as saying that the decree itself, in essence, will apply to that as well, because it is an obligation that the government created, which said we're going to pay it. This is the ultimate money bill. And and for that reason, I think that you read the language towards its purpose. You know, the purpose and I think the purpose is important because a consent decree is designed to for the parties to effectuate their agreement about a problem, but then have the the contempt power of the court to enforce it just in case somebody breaches it. And quite frankly, the government's been in breach of its own statutory obligations right out of the box. I mean, as early as the 64 audit, which is why and by the way, obviously, I'm addressing both our cross appeal and the response to the government. I was going to indicate, Mr. Klassner, that we would want to at some point turn to your cross appeal, but you're free to do that at any point that that you choose. And again, we're not going to be wedded to the clock here. So I know. Thank you, Your Honor. I know the court's procedure with a cross appellant is to do it all in one. Yes, sir. One fell swoop. The real money in this case, quite frankly, is the actually determined contribution. You know, turn it up one person at a time when there's nine thousand people out there that we don't have enough money for is the real issue. What about that, though? What about the true up process? And I I understand that that's a more recently implemented phenomenon. When did that begin? When did it began before my arrival in this case? But sometime I would say after 2010, the current administrator, Mr. Nibbs, implemented it because there is a provision in the plan that says you're not supposed to get a pension if there's contribution to owing on your behalf. And if we so. So is it safe for this panel to conclude court, at least at this point, to assume that from the point of implementation of the true up process, that it's been used effectively and that as a consequence of that use, there have not been any missing employer contributions with respect to those individual annuitants or pensioners? No, because the ADEC or the ADC, the actuarial required contributions still hasn't been paid. The true up catches the missing employee contributions. Somebody might have been off the payroll for a day or two and it catches that same period employer fixed rate contributions. It doesn't cover the ADC. In fact, we had not paid anybody. We would be impoverished, all 8,700 retirees at the same time. There have been individual instances in which that ADC has been paid, I think, for police officers who are a small portion of our overall population. But the answer is no, they haven't paid, which is why we're running out of money. Go ahead, Judge Chigares, please. Well, I was going to actually ask another, since we're focusing on true ups, how do we know that RSM didn't take account of true up employees in its prior period calculation? Isn't it possible that a significant number of employees have essentially been double counted? No, because as I understood RSM's report, as I understood their testimony from the stand, and certainly your reading of the testimony is much more important than my summary of it. But RSM's conclusion was that the true up is a relatively recent phenomenon, so the prior period didn't involve any true ups. You just came in, if you had all your NOPAs, which is your Notice of Personnel Action, so that we could cover your entire career, you got a pension check. It was only in the later period where the true up was used on an individual basis, but again, the true up caught missing fixed rate contributions. It didn't catch the greater money, which is what's leading this plan to its insolvency. So there was no true ups, you're saying, in the prior period calculation? Not that I am aware of, nor that I think the record reflects. Okay. I think Judge Gomez got it right on the fixed rate contributions, and it's interesting because his opinion really is specific and incisive in the manner in which it discusses all the details. Can I ask you another question, then? It does go back to the retroactivity discussion. You defend the district court's reliance on the 11th Circuit's Shook opinion. That dealt with post-judgment interest. What about cases like the 10th Circuit's UMIC case involving prejudgment interest? Why shouldn't that be applied? Because this is an obligation which is not the result of the judgment. It's an obligation which the government consented to in an agreement back in 1984. And for that reason, I think it is distinct. And again, this is a situation usually where you see a statute and it's going to be applied retroactively. It's the legislature applying the law to two other people or two other entities. This is the government passing a law to apply to itself. And why would it apply the law to itself if it wasn't going to have the purpose for which it was intended, which is the time value of money was lost? As you know from the scholarly material provided, 60% ultimately of the value in a defined benefit retirement plan comes from investment. But if we're not getting the money to invest, which as you see from the most recent reports, despite very good returns, we don't have money to invest anymore. We've had to fire all our active managers and just follow the market in an index. And it's not generating enough income. And absent a massive infusion of cash, the system is going to go. The government, I think the best example is the government said, you know, when it was seeking us that when it's on a stay here, said we don't have $63 million. Our annual retiree payroll is $263 million. So their statement at various points during the proceedings is that I will pay as you go. If the system runs out of money, that's a fantasy. And it isn't going to happen. No defined benefit plan can survive. And a defined benefit plan is one that's based on an actuarial reserve. And as our supplemental brief showed you, that term's been in effect at least since the 40s with the New England Telephone Company case. And it's gone all the way through the actuarial text, which were provided. And all of the statements from the Society of Actuaries and their standards of practice, which says you decide. Here's how it works. When somebody comes to work, we know that that person's got to work 30 years to get a pension. And we know what the approximate increase in salary is going to be from day one to the last day. And you know what the chances are based on statistics that that person's going to stay or quit or die or become disabled. And based on all the statistics, we say for that person, you've got to put in X dollars every year into the fund. And we assume it will earn money. Mr. Klesner, this is not really connected, this question, and the information it seeks to connect it to the specific legal issues that are before us. But do I recall correctly that the government of the Virgin Islands is the largest employer within the territory? As far as I know, they are. It's a significant proportion, certainly, of the population. There are about 100,000 people in the Virgin Islands. 8,800 of them are retirees of our system. 8,800 of them, give or take a few, are active employees of the system. So 16% of the population. The actuary assumes 100% of them are married. So now double that number. And we're talking about a third of the population. That was my understanding, which certainly leads to the gravity of the situation before all of this. And I'm sure accounts for why this case and its implications may cost you sleep at night. And I can assure you that it concerns this court greatly because the U.S. Virgin Islands is not only a part of our jurisdiction within the Third Circuit. We have close relationships otherwise with the territory. And as a consequence, concerns about its well-being and fiscal stability. Before you close, I want to make sure that you have had an opportunity to argue as much as you wish your cross-appeal. And we will then, as a consequence of that, forward to Mr. Scherker certainly more than the three minutes that he reserved for rebuttal to address anything he wishes on the cross-appeal as well. But do I understand you to be arguing that effectively 718F is superfluous as it stands, if it doesn't go on to impose an employer contribution requirement on GDI that's independent, if you will, of its obligation to contribute fixed percentages of employee compensations? Is that really what you're arguing? Yes, that's exactly right. So why is it superfluous then to read 718F as simply requiring that the GDI's fixed percentage contributions that are enumerated in subsection G be calibrated to the changing actuarial needs of the system rather than, for example, remaining static over time and potentially underserving the pension system? G is intended as a floor. In other words, it's a minimum contribution. And if all these contributions had been made when they were due, there would be years in which F wouldn't be necessary because the actuary says you need X dollars. And if the sum of the employee contribution and the sum of the G, the fixed rate contribution, and the sum of the earnings are more than sufficient to pay this year's actuarial share of the mortgage, then F would not be necessary. Let me give you one reason why that position, which, again, I don't find supported by the text, but why that position bothers me in this particular case, and that is that even simply looking to the experts' testimony and what we know about gaps in the record, if you will, what we know about the unavailability and possible unreliability of records, it occurs to me that not all of the fault for that rests with the government of the Virgin Islands and that some of it may well be indeed probably is a function of some mismanagement or oversights on the part of GERS over the years. So isn't your position essentially to suggest you're a guarantor here, government, of everything that's happened in the past that has left us in this situation of insolvency or near insolvency? The answer to that is, you know, nobody's without sin ever. But in this particular case... Not even judges, I can assure you of that. Nor those who argued before you. But since the beginning, the government said, we're going to guarantee this, and we're going to make sure that we maintain an actuarial reserve. And on more than one occasion, we've tried to get somebody to listen to us to put the money in the actuarial reserve. And at the behest of the government, most recently, this court back in 2005 said, well, we don't know for sure that it's going to go under. Well, it's going to go under. This is a train that's rambling right towards the end of the tracks with a big gorge in front of it. And the decree was the tool. And for the last five years, that's what we've been fighting over, is trying to get the money. I don't ascribe bad motives to the government of the Virgin Islands. They have financial problems. The hurricanes and the pandemic and just the fact that it kind of gets ignored by its parents to the north hasn't helped its economy over time. But that's not going to help these retirees and these workers. This is part of their pay. A pension is just deferred compensation for labor performed. And my active workers, their contribution of 11% is going right to the retirees, and it leaves nothing for them. And it's more than just deferred compensation. It's an expectation and an expectancy upon which people's futures are predicated and planned. And that is something that has more than just a monetary value affixed to it. So I understand exactly what you are saying, Mr. Klasner. Before we draw your presentation to a close, two points and perhaps anything you would like to say by way of wrap-up you can add at this point. But I'm going to ask the same or similar question to Mr. Shurker, and that is this. Because there is a certain amount, a fair amount at least, of foreboding in all of this, no matter how this case comes out. Whether the retirement system came out with zero or with $18 million-plus, or whether $18 million-plus, what the interest and penalties amount to, we know the insolvency problem of the system. And we also know just what the full faith and credit of the government of the Virgin Islands may amount to through no one's malicious intent here. So where does everyone go after this is over, assuming that there is either a substantial judgment sustained against the government, or with or without that, there is the pending insolvency of the system ahead? This court can simply rule. We will simply enter judgment supported by an opinion. But that judgment is going to have to mean something. And as I look ahead, I'm wondering whether the parties are thinking anything about that, whether they're thinking anything about the tomorrow that follows the entry of our judgment. We think about the tomorrow every day. The board is going to be forced to just cut payments. Even though the statute says we're supposed to pay $100, we're going to have to drop it down to $50 or by some measure or something, because we're going to run out of money. And maybe something is better than nothing. Something for a larger number of people is better than full for some and nothing for everybody else. But Judge Mady actually asked a question that relates to that, which is, what do you do with the judgment? Because what's there to execute against, even if you could do that? The answer is if we got a judgment for which affirmed Judge Gomez's order on the $63 million and reversed his order and also said the actually determined contributions which are missing are owed to you too, which they are, because that's what will either make or break the survival of the system. It's hoped that we can monetize the debt independently in the market. And I know this is divorce the record, but I had the privilege of working on it. I'm really inviting that, so that's effective. I worked on the Detroit bankruptcy case, and I was the constitutional lawyer along with Lisa Blatt from Washington. And Jerry Rosen is an old friend of mine going back to earlier days in the district court. And a fine jurist who had a horrible thing to have to deal with. Detroit's pension plans were actually fully funded at the time the city declared bankruptcy, so they were able to survive. Detroit had a $6-7 billion art collection in the magnificent art museum that it has, which it took and monetized that to get the money to bring the city out of bankruptcy. And maybe everybody has to give a little bit. But without that large judgment, $63 million isn't going to make a difference. That's three months' worth of retirement payroll. It's the larger money, the actually determined contribution, and I understood why that may have crossed Judge Gomez's mind that I don't want to be the one who levied a billion-dollar-plus judgment against the government of the Virgin Islands. But the consent decree has said from day one, all contributions under 718. The ADC is in there. Counselor, can I pick up on that point just before you go back to the – because I want to – I appreciate you returning to the question I posed earlier. So putting aside Detroit for a moment, because as you said, that dealt with resort to the bankruptcy process, what's your authority for how it is that we are able, as an article-free court, to order the kind of judgment that you seek here? What can you point me to that is similar in circumstance that would give comfort to this court's understanding of how it has the power to enter the judgment that you seek? Because the parties agreed that the government would pay all contributions due under 718. This is really nothing but an old-fashioned equity proceeding, isn't it, Counsel? It's kind of what it's turned into. Well, in fact, the original consent decree recites the word trust, which is a vehicle of equity principles reaching back centuries. Counsel, just if I can pick up on that, given that this is a commonplace agreement and given that obligations by governments across the country tend to exceed their ability to pay, I would think that this would be a familiar and kind of off-the-frame procedure that we would see. And yet, to be candid, I can't find anything similar to this. So I'm wondering if it is common as we seem to think it is, where are the other examples of where it's been common? I can point, the state case, the state law cases, which we've pointed you to, the Kauanohano case in Hawaii, and forgive me for what I'm sure many of you know. And the state, and if I could just on that point, the state cases tend to arise under pre-existing state obligations. States often, for instance, guarantee principles in their own constitution. So it's a state constitutional guarantee that's being provided. Or the state has also created a statutory system for funding. It said, hey, we're going to raise revenue in the amount of X, and we're going to devote it to principle Y, and then, for whatever reasons, they don't. Here, we don't have either of those things, right? There isn't something that, you're not availing yourself to something external to the consent decree, other than the statute itself. The statute is a funding mechanism. It is not necessarily, I know you may take a different view, it is not necessarily a revenue raiser itself. So I'm trying to find something that fits those kind of narrow constraints. Well, I think it is a money bill, because it requires the revenue within it. It says the government shall pay. And, you know, the term money bill in American jurisprudence really goes back to the concept of the origination clause. That is, you know, financial bills originate in the House, and they can get amended in the Senate. And we really don't have that issue here, because it's a unicameral legislature. But in the Organic Act, there is an impairment of contract provision. And the courts have held, Kendall particularly, have held that the right to the pension is a contract. We look to the sister courts in the United States, which say that the contribution to the system is a part of the benefit. And in our supplemental brief, we cited Scaglione out of New York, says no, the promise is meaningless if you don't put in the money. And in the case of the state cases we've cited to you, some of which I participated in, there were large sums of money, which the states or the participating municipal employers were not happy about having to pay. But the court said, you know, a contract is a contract and a promise is a promise. And I, you know, don't expect we're going to be having a fire sale by the cruise dock there of buildings owned by the government. But getting the full obligation that everybody willingly took on, the government took it on when they created the plan. They took it on when they induced all these workers to spend their lives in the service of the people of the Virgin Islands, and still working for the people who were basically paying part of the government's contribution with their hard-earned money. And in the decree itself, not once but twice, said we will pay all contributions due under 718. If this is a statutory construction case, which I think it is, and if this is a contract construction case, which I think it is, the plain language prevails. As I think Judge Smith says, and you may have said it yourself, Judge Maney or Judge Chigars might have said it, that, you know, how it gets paid isn't your problem. The fact that we have the vehicle by which we can vindicate the interest at issue in the consent decree is this court's responsibility to observe your own judgment. And for that reason, and I thank the court for its generosity of time and your thoughtful questions, that we ask you to do the following. We ask you to affirm Judge Gomez's ruling as to the fixed-rate contributions with the penalties and interest. We ask you to reverse his ruling as to the ADC and say that that is also a covered obligation under the decree. And I thank you for your time. Thank you. Judge Chigars, do you have any questions before we turn back to Mr. Shurker? I have nothing more. All right, thank you very much, and thank you, Mr. Klasner. Mr. Shurker, you have rebuttal, and as I've indicated, we're not going to adhere to clock-watching here. Are you with us? Are you muted? Sorry, I had to unmute, Your Honor. That's understood. This is all still a little new for me. It is for me as well. To pick up on the question that Chief Judge Smith, you asked of Mr. Klasner, it's hardly the case, and I think the documents in this record are sufficient to tell the court, that it's hardly the case that the government of the Virgin Islands is taking a cavalier approach to the problems of GDRS. Its own conduct shows that it's not. The prior period employer contributions were identified in 2012. The settlement agreement followed shortly thereafter, and the continuing true-ups, including the lump-sum payments, have started then and have continued now. The fact that we're challenging the $18 million should not be taken as anything other than what it is, which is a legal challenge to an $18 million judgment that has $49 million in interest and penalties tacked onto it, because we are making prior period employer contribution payments and have been for a long time. That's what you asked. How do we know that RSM didn't take the true-ups into account? We know because it's in RSM's report at 4048 through 4049 of the appendix. RSM said we did not take those into account. What RSM said also is, under the question, potential impact on calculation. Had such information been made available, it may decrease GBI's potential obligation. Right. So the RSM did not take those numbers into account in order to district court in ordering $18 million, and that's our fundamental challenge beyond the four corners, in addition to being beyond the four corners of the consent judgment. I can tell the court that the GBI has been looking at its options for funding RSM. I can tell the court that the GBI is contemplating borrowing on tax revenues and achieving a cash flow advantage by doing so and to fund GRS from that. But the court doesn't have to look beyond the record to see that the government is funding the prior period employer contributions. Now, the question is, can GRS succeed in getting more than that out of a legal proceeding? Now, the district court ruled that the so-called ADEC, which I now believe is being called ADC, is beyond the four corners of the consent judgment, and the court took a very practical approach. The consent judgment says you have to make biweekly payments. I don't see anything in Section 718F that says this supposed additional payment is supposed to be made at any particular time. It doesn't say weekly. It doesn't say biweekly. It doesn't say biannually. It doesn't say annually. I can't fix a point in time at which this payment is supposed to be made, so I cannot shoehorn it into the consent judgment. And that type of payment has never been made, right? The testimony from the commissioner of finance is that nothing has ever been appropriated for ADEC or ADC or whatever it's being called. That's correct. The reason it isn't appropriated is because there's nothing to appropriate under Section 718F. Now, that doesn't mean that the government of the Virgin Islands is prohibited from making direct contributions to GRS, and it does so as of now to the tune of $42 million, but that's not a statutory compulsion that requires that to be done. It would be the equivalent of saying that the government couldn't have allocated dollars during the pandemic for various worthwhile causes because there was no statute that compelled the government to do so. The government is making direct contributions to GERS in the course of the government's duty to do exactly what we're talking about here today. The question is whether subsection F is anything more than what it appears to be on its face, which is how do you measure the biweekly employer contribution? How do you measure that? And if you go back to the statute's antecedents, it all fits perfectly into place. In 1959, when the system was created, there was a one-paragraph version of Section 718, and in that paragraph, there was a fixed employee contribution of 4%. The government's contribution was not fixed in any way. It was supposed to be actuarially determined, and the government actuarially determined that its contribution would be 4%. And every year, and it's GRS who supplied the court with their internal documents that show this, every year from 1959 through 1967, GERS said we need to raise the contribution and we need it to be fixed. And in 1968, the government said, okay, we are imposing a fixed contribution, but we are not taking out the requirement that the contribution be actuarially determined. And so the way the statute works is subsection F says actuarially determined. Subsection G creates the fixed percentages. The fixed percentages are not plucked from the sky. They're not floating around in the ether. Those fixed percentages are to be determined on an actuarial basis. And the reason we know how that's to be done is because when 17A, 17 capital A, was adopted in 2005, it put the obligation on all the parties to assist the government in coming up with how the employer contribution should be set. The answer to the funding problem is the answer that GRS demanded of the government. In every overview, starting in 2013, increase the employer and employee obligations. And the way the employer obligation is to be calculated is explained in subsection F. And that's where the funding has always come from. That's what GRS always asked for until 2016, when ADEC made its first appearance and it began to be argued as something other than what it is, which is simply the government having continued the requirement that it first adopted in 1959, that the government's contribution is to be actuarially determined. And it exceeded to GRS's wishes by establishing fixed percentages that have increased from something like 7% to 20-something percent. I don't recall the exact number that Mr. Foster told us is the most recent number. And that's how the system is funded. And those monies are then used for interest income and for investment. And if the court looks at the GRS's reports, which are all on the record beginning with 2013, GRS has been a very active investor in the Virgin Islands with its monies, which it's using to raise additional monies to pay the employees as they retire. That's the definition of a soundly funded system. Now, in terms of additional dollars, the government understands, and I think we've made it perfectly clear in our papers and by our conduct, that the government understands that GRS has additional needs for additional funding. But that doesn't justify rewriting the consent judgment. It doesn't justify turning subsection F into something that it is not and never has been in order to raise additional monies for GRS. Thank you. Is there anything further from either of my colleagues? None for me. I'll pick for them. If not, thank you very much, Mr. Shirker. Thank you very much, Mr. Klasner. Mr. Cain, the panel will request that a transcript of the oral argument be prepared. I would also suggest to both of counsel what I think is the obvious. The fact that we've given the amount of time to this case this morning beyond what is traditional in terms of our oral argument timing and what each side has certainly suggests the importance, even the gravity that the Third Circuit attaches to this dispute that is before us. And as we have a number of us have adverted earlier in this proceeding to the future implications of this, something that I'm sure both sides and both of counsel present take very seriously and have thought about. And I'm sure we'll continue to think about because this matter will not be over by any means when the court enters its judgment, when this panel files a judgment in the matter. And many people, including the overall fiscal well-being of the U.S. Virgin Islands, will be, if not at stake, will be impacted greatly. So I thank both of counsel for their excellent oral arguments. We'll take the matter under advisement.